# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MARK A. JONES,                          )
                                        )
        **Plaintiff,**              )
                                        )
   **v.**                            )          **Case No. 3:07-0645**
                                        )          **Judge Echols**
NISSAN NORTH AMERICA, INC.,             )
                                        )
        **Defendant.**              )

## MEMORANDUM

Pending before the Court are cross-motions for summary judgment filed in this action alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Tennessee Handicap Act ("THA"), T.C.A. § 8-50-103. Defendant Nissan North America, Inc. ("Nissan") has filed a Motion for Summary Judgment (Docket Entry No. 21) in which it asserts that judgment should be entered in its favor and that the Complaint be dismissed. As an alternative, Nissan asserts that Plaintiff was terminated for reasons unrelated to his ADA or THA claims and therefore Plaintiff has no claim for lost wages subsequent to the date of his termination and no right to reinstatement or front pay in lieu of reinstatement.

Plaintiff Mark A. Jones ("Jones") has also filed a Motion for Summary Judgment (Docket Entry No. 26). Jones claims Nissan erroneously regarded and treated him as disabled when he was not. Therefore, Jones asks the Court to find Nissan liable and set the matter for a damages hearing.

Both motions for summary judgment have been fully briefed by the parties.

1

# I. **Factual Background**

Jones worked for Nissan as an auto assembly production technician at its manufacturing plant in Smyrna, Tennessee from July 14, 1997 until July 25, 2006. The work of a production technician is repetitive in nature and, during the course of a typical eight hour shift, employees rotate among various stations doing tasks on different parts of a vehicle coming down the assembly line.[1]

In May, 2001, Jones reported experiencing "trouble with [his] hands" in that his hands would "lock up" and become numb. Subsequently, Douglas Weikart, M.D. ("Dr. Weikart"), one of Nissan's workers' compensation panel physicians, performed carpal tunnel and finger release surgery to both Jones' right and left hands.

In April, 2003, Jones injured his right elbow while at work installing hoods on Nissan Altimas. Jones reported the injury to his area manager, Tina Cooper, who sent him to the in-house medical department. After examination by a physician, Jones was sent home where he remained for a couple of days. Upon returning to work, Jones was still experiencing pain and he went to the medical center. Jones was given a list of approved outside doctors and he chose to see Dr. Weikart because Dr. Weikart had previously performed his carpal tunnel surgeries.

Dr. Weikart diagnosed Jones with cubital tunnel syndrome and right lateral epicondylitis (tennis elbow). Initially, the condition was treated conservatively, including cortisone injections for pain. However, Jones continued to experience pain, and, in September, 2004, Dr. Weikart performed surgery for both cubital tunnel syndrome and tennis elbow and Jones went on workers' compensation leave from Nissan.

---

[1]For example, an employee may begin the shift by aligning doors on the passenger side of a vehicle. After two hours, that same employee may be rotated to align the front hood or deck (trunk) lid of the vehicle.

In December, 2004, Jones returned from workers' compensation leave and, in January, 2005, Dr. Weikart released Jones to return to work with no restrictions on his physical activities.[2] Dr. Weikart gave Jones a three percent permanent partial impairment on his right upper extremity. From his return to work in January 2005 until he was placed on leave in June 2006, Plaintiff satisfactorily performed his job without any physician-imposed work restrictions.

In August 2005, Jones filed a workers' compensation complaint in Wilson County, Tennessee styled *Mark Jones v. Nissan North America, Inc. and Ace American Insurance Co.*, No. 05269. In those proceedings, Nissan took the position that Plaintiff "has no permanent restrictions, and neither his work status at Nissan, nor his availability for overtime work have been affected by his right elbow injury." (Jones SOF ¶ 4). Nissan also asserted that Jones "has no restrictions that prevent him from continuing in his present job rotation" and that "nothing about his position at Nissan has been affected by this injury or treatment for the injury." (Id.).

The workers' compensation case was tried before Chancellor C.K. Smith on June 8, 2006. At trial, Jones testified that despite his surgery he was "still having pain" and that he had constant pain in his right elbow when using it. He further testified that he did not have the strength in his arms that he had prior to surgery. Jones also testified that he could not lift the same things as before and that when he did things at home, such as use a screwdriver, he had to take breaks since his hands got tired a lot easier and more quickly than they did before.

With regard to working at Nissan, Jones testified that at the time of the hearing he was working in the "body fit" section where employees adjusted doors, fenders, hood and deck lids so

---

[2]Jones told Dr. Weikart that if he were placed on restrictions which allowed only partial use of his right arm, Nissan would not let him go back to his job because Nissan was very strict about restrictions.

Case 3:07-cv-00645   Document 74   Filed 09/12/08   Page 3 of 24 PageID #: 2047

that they were flush and did not have gaps. This job consists of using a hammer and chisel to tap parts so they align properly. Jones testified he could do that job, even though his grip strength was not what it used to be. However, Jones testified that he could not do the job he was doing before working in the body shop department at Nissan because of the amount of lifting that was involved.[3] He also stated that he did not believe he would be able to use power tools because of the vibration.

At the conclusion of the trial, Chancellor Smith made oral findings from the bench. The court awarded Jones permanent vocational disability benefits in the amount of $35,940.

In his oral findings, Chancellor Smith found that Jones was "still having pain and couldn't probably do the job that he was doing at the time of his injury because it required a lot of lifting and more use of vibratory tools."[4] (Nissan SOF ¶ 10). The court also stated that when Jones "has to use a screwdriver to screw something in, he has to take breaks. It's painful." (Id.). The court recognized that the "extent of industrial disability or vocational disability – anatomical disability given by the doctor was three percent as stated." (Id.). The court also stated " based upon all evidence I've heard – and I do think he has some restrictions and because of that and the pain and the restrictions that I feel like he has based upon his testimony, I think he's entitled to 30 percent vocational disability." (Id.).

In response to a request by Nissan's counsel for clarification of the restrictions that the court found, Chancellor Smith stated as follows:

---

[3]It is unclear from the filings exactly what that previous position entailed, other than that Jones referred to it as being in the "body shop" and it involved lifting and the use of power tools.

[4]The reference to the "job he was doing at the time of his injury" is not clear. It appears, however, to be a reference to Jones' work in the "body shop," as opposed to Jones work in the "body fit" department.

4

> I think using – I think tools – like I stated – vibratory tools, lawn mower, weedeater, anything that would vibrate will cause his elbow to hurt. And I think lifting – he testified to lifting and rolling motion of his arm kind [sic] hurts him and throwing balls and stuff like that. I think that those are legitimate. And that's what he testified to. Those are the only ones – and he has constant pain all the time as well. Has grip strength loss. I think that's about – I think I've covered most everything. I might have left something out. But I think those are the things that – that I feel like that he's lost as a result of this.

(Id. ¶ 11).  Chancellor Smith followed these statements by observing that he believed Jones' vocational disability was substantial and something which Jones had to live with the rest of his life and was therefore entitled to a vocational disability rating of 30 percent.

Shortly after the hearing, Chancellor Smith entered a written order which, in relevant part, stated:

> Plaintiff retains a 3% permanent anatomical impairment to the right upper extremity. Based on this rating, his restrictions against working with power tools and against lifting, his ability to return to his pre-injury employer at or above his pre-injury wage rate, his education, his job skills, and his employability on the open labor market, Plaintiff retains a 30% permanent disability to the right arm. This entitls Plaintiff to 60 weeks of benefits at the stipulated weekly rate of $599.00, all of which have accrued at the time of trial, and, therefore, are due and payable in a lump sum of $35,940.00.

(Id. ¶ 12).

Nissan appealed Chancellor Smith's award. Subsequently, Nissan and Jones entered into a settlement agreement. Nissan dismissed its appeal and paid the workers' compensation judgment of $35,940 in permanent partial disability benefits, plus $280.00 in discretionary costs with the order of "future medicals staying intact." Jones agreed to "completely end" his workers' compensation case. (Id. ¶ 15).

After Chancellor Smith's ruling, Kerry Dove ("Dove"), Nissan Department Manager for Safety and Medical Management, discussed the impact of the court's ruling as to Jones' restrictions

with Nissan's legal department. Ray Coss, Esq. ("Coss"), a member of the legal department, claims that Nissan interpreted the court's order as imposing on Jones' permanent restrictions of "no lifting, no use of power tools and no use of hand tools." (Id. ¶ 16). Chancellor Smith's ruling placed Nissan in a unique position as it was the first time it had been presented with a judicial order suggesting restrictions which had not been imposed by the treating physician. Nissan decided to impose restrictions of no lifting, no use of power tools and no use of hand tools, and claims it believed that was what was required by Chancellor Smith's ruling.

Nissan's Employee Handbook contains a section dealing with the placement of an employee who has been deemed to have medical restrictions. Specifically, the Handbook provides:

> A Medical staff member and manufacturing management will first evaluate your current job assignment to determine if placement is possible. If management cannot place you in your former job assignment, they will then evaluate your former work group and then other assignments within your home department. If placement on a full job assignment within the home department is not an option, you will be placed on leave.

(Id. ¶ 22).

Dr. Anne Kubina, M.D., ("Dr. Kubina"), the Medical Director of CHS,[5] was provided an email which summarized the Chancery Court's ruling and was asked to document in Jones' medical records the restrictions which were purportedly ordered by the court. On July 18, 2006, Dr. Kubina drafted a note for Jones' medical records which indicated that while Jones was not seen in the office, "a recent court ruling has caused him to have new permanent restrictions." (Kubina Depo. Ex. 1). In the "Plan" section of the notes, Dr. Kubina wrote "[p]er recent judicial ruling, EE [employee] now

---

[5]CHS contracts with Nissan to provide medical services for employees at the Smyrna facility.

has the following permanent restrictions: no lifting, no use of power tools, and no use of hand tools." (Id.).

Dr. Kubina did not examine Jones or review his medical records before issuing the restrictions, nor did she speak with Jones' supervisor about Jones' ability. As a general rule, Dr. Kubina examines an employee before issuing medical restrictions. Further, neither Dr. Kubina nor the medical department manager reviewed the Chancery Court's Order or the hearing transcript before placing Jones on medical restrictions.[6]

After imposing the restrictions, Dr. Kubina informed Josh Emery ("Emery"), the placement coordinator for CHS, about the restrictions. Emery and Gene Crane ("Crane"), a Human Resources section manager, then told Rodney Shaw ("Shaw"), Jones' department manager, that Jones had been placed on restrictions by the Chancery Court. The trio then sought to determine whether Jones could return to work with those restrictions.[7]

Based upon his experience in the body assembly section for seven years and his familiarity with overall plant operations, Shaw informed Crane that "we could not accommodate those [Dr.

___

[6]Nissan has a Comprehensive Medical Examination ("CME") policy "that is in place to provide an evaluation of a very limited number of employees to determine whether they're at risk to continue working at Nissan or whether or not they should have restrictions applied so that we can safely return them to work." (Jones SOF ¶ 32). "The CME program is designed to determine if an employee that has multiple injuries to multiple body parts can be successful working in this environment." (Id. ¶ 33). Plaintiff was not selected for evaluation under the CME policy which would have required an independent medical examination by an outside physician.

[7]Among his duties as a placement coordinator, Emery was required to try to find work for employees who had been placed on medical restrictions. When he first learned of Jones' "restrictions," Emery "pretty much knew there was nothing we could find for him." (Emery Depo. at 17-18).

7

Kubina's] restrictions in any of our jobs." (Nissan SOF ¶ 26). On July 24, 2006, Shaw and Emery exchanged emails and concluded that there was no rotation which would allow one with Jones' purported restrictions to work in the body assembly, automation/metal assembly department.

On July 25, 2006, Jones was told to report to Human Resources because he had been placed on medical restrictions. Jones went to the Human Resources department and was informed that he was being placed on a leave of absence. Employees on a leave of absence are not paid, but Nissan continues to pay for medical expenses. Jones was instructed to go home and report back to Human Resources on August 2, 2006.

On August 2, 2006, Jones returned to Nissan and met with members of the Human Resources department regarding his leave of absence. Jones was informed that Dr. Kubina had placed permanent restrictions on him of no lifting, no use of power tools, and no use of hand tools. Patrice Dixon, R.N., a Human Resource Specialist for the Medical Management department at Nissan, advised Jones that "a job search had been made and no full rotations had been identified" within his restrictions. (Nissan SOF ¶ 33). At the meeting, Jones was informed that he was on an indefinite leave of absence and not entitled to work while on leave without permission from Nissan. Jones was also informed about applying for long term disability benefits through Nissan's LTD carrier. A summary of the meeting was prepared, which Jones refused to sign.

Nissan's Employee Handbook contains a provision relating to working while on a leave of absence and provides that an employee "may be terminated for performing unauthorized work for pay, profit, or other personal or family gain, while on any leave of absence." (Id. ¶ 34). The Handbook also provides that certain rule violations justify immediate termination, subject to peer

8

or management review, and includes "[w]orking for pay or profit while on an approved leave of absence without advance permission." (Id. ¶ 35).

During his deposition in this case in January 2008, Jones testified that he was working for American Residential Services, a heating and plumbing outfit, as a fleet manager. Jones also admitted he did not receive permission form Nissan to work while on leave.

On January 22, 2008, the Human Resources department at Nissan recommended that Jones be terminated for working while on a leave of absence. The recommendation was approved by Jones' department manager, Nissan's senior counsel, the director of Human Resources, and others at Nissan. Jones was informed of the decision by letter dated January 25, 2008. While Jones had the option to request peer or management review, he chose not to do so.

In addition to this case, Jones filed a complaint in the Circuit Court of Davidson County, Tennessee, against Nissan. In that action, Jones alleges Nissan discharged him and refused to return him to work in retaliation for exercising rights under Tennessee workers' compensation laws.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. LEGAL ANALYSIS

As indicated at the outset, Jones claims that he was terminated in violation of the ADA and the THA. Both parties have moved for summary judgment, and their claims will be considered after a general overview of the relevant substantive law.

### A. General Overview of ADA and THA Law

The ADA provides "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Similarly, the THA provides "[t]here shall be no discrimination in the hiring, firing and other terms and conditions of employment of . . . any private employer . . . based solely upon any physical, mental or visual handicap[.]" Tenn. Code Ann. § 8-50-103(a). Because of the similarity of these statutes, "[a] claim

10

brought under the THA is analyzed under the same principles as those utilized for the Americans with Disabilities Act ("ADA")." Sasser v. Quebecor Printing (U.S.A.) Corp., 159 S.W.2d 579, 582 (Tenn. Ct. App. 2004).

"To prevail in a disability discrimination case, a plaintiff must show: (1) []he was "disabled" under the ADA; (2) []he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; (3) []he suffered an adverse employment action; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) a nondisabled person replaced h[im]." Nance v. Goodyear Tire & Rubber Co., 2008 WL 2151626 at *10 (6th Cir. 2008). "Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. "If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." Id.

Under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(I). One is "substantially limited" if he or she is "(1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The determination as to whether an individual is substantially impaired in a major life activity is made as of the time

11

that the adverse employment decision was made.  Kocsis v. Multi-Care Mgt. Inc., 97 F.3d 876, 884 (6th Cir. 1996).

The ADA prohibits discrimination not only against those who are disabled, but also those who are regarded as disabled.  The "regarded as" prong "protects employees who are 'perfectly able' to perform a job, . . . but are 'rejected . . . because of the myths, fears and stereotypes associated with disabilities.'"  Gruener v. Ohio Cas. Ins. Co., 510 F.3d 661, 664 (6th Cir. 2008)(citation omitted).  According to the Supreme Court, ["[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).   "In both cases, it is necessary that a covered entity entertain misperceptions about the individual - it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  Id.

**B.  Defendant's Motion for Summary Judgment**

In moving for summary judgment, Nissan raises several arguments.  Related arguments are grouped together under separate sub-headings.

**1.  Effect of Chancery Court Ruling**

Nissan asserts it is entitled to summary judgment because its actions were in compliance with the Chancery Court's ruling.  It also asserts, based on that ruling, that Jones is judicially estopped from proceeding with his present claims under the ADA and THA.

12

Nissan first argues that it cannot be held liable because all it did was apply Chancellor Smith's decision. However, the evidence can easily be read to suggest that Nissan did much more than simply implement Chancellor Smith's ruling. Chancellor Smith was not asked to make a determination whether Jones was able to work at Nissan. Instead, he dealt with the discrete issue of whether Jones had a compensable injury under Tennessee's workers' compensation statute. Nevertheless, Nissan took that ruling, had its in-house physician place limitations on Jones that were not in place by his own physician, and then, based upon those limitations, placed Jones on leave because he purportedly was restricted from doing his job.

Regardless of whether its construction of the Chancery Court's ruling was correct, Nissan argues that, as an employer, it is entitled to exercise sound business judgment and "where an employer takes a job action based upon an 'honest belief' rather than discriminatory animus, the employer will not be found to have engaged in any unlawful discrimination." (Docket Entry No. 22 at 12). Nissan then points out that the Sixth Circuit in Pesterfield v. TVA, 941 F.2d 437, 443 (6th 1991)(citation omitted) explained "[t]he question is not whether [the employer's] decision that plaintiff was not employable due to his [medical] condition was correct measured by 'objective' evidence, the relevant inquiry is whether the employer 'in fact, acted on its good faith belief about the plaintiff's condition.'" This formulation has been referred to as the "honest belief" rule and was adopted for use in ADA cases by the Sixth Circuit in Smith v. Chrysler Corp., 155 F.3d 799 (6th Cir. 1998).

In relying upon Pesterfield, and its "honest belief rule," Nissan neglects to consider that the "the protection afforded by the rule is not automatic." Id. "As was noted in Pesterfield, once the

employer is able to point to the particularized fact that motivated its decision, the employee has the opportunity to produce 'proof to the contrary.'" Id. (quoting, Pesterfield, 941 F.2d at 443).

In this case, Jones has presented evidence from which a jury could conclude that Nissan was not acting pursuant to the Chancery Court ruling.  Leaving aside that the Chancery Court actually took into account Jones' ability to continue working at Nissan in issuing its ruling, and leaving aside that the Chancery Court was dealing with Jones' entitlement to workers' compensation and was not dealing with Jones' employability generally, there are several factors which suggest that Nissan was not acting pursuant to the Chancery Court's decision.  At the time of the Chancery Court decision, Jones had been released to return to work by his treating physician with no medical restrictions.  He worked for approximately eighteen months thereafter until he was placed on leave and, during this time, he capably performed his job.  It was only after Nissan lost the workers' compensation claim that it approached its in-house doctor to write restrictions which (though purportedly pursuant to the Chancery Court's decision) most assuredly would lead to the end of Jones' employment at Nissan. Those restrictions were imposed even though Dr. Kubina had not examined Jones, had not consulted with Jones' treating physician, and had not read the Chancery Court's ruling.

The Court also rejects Nissan's assertion that the Chancery Court's ruling judicially estops Jones' present claims.  The Sixth Circuit has recently summarized the doctrine of judicial estoppel as follows:

> Judicial estoppel is an equitable doctrine that "is utilized in order to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" . . . Although there is "no set formula for assessing when judicial estoppel should apply," courts consider whether: (1) a party's later position is clearly inconsistent with its earlier position; (2) the party has succeeded in persuading a court to accept that party's earlier position; and (3) the party advancing an inconsistent position would gain an unfair advantage if allowed to proceed with the argument.

14

We have noted, however, that judicial estoppel must be "applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." . . . Judicial estoppel is therefore generally limited to circumstances where a party asserts a position in litigation that is adopted by the court, gains an advantage through that assertion, and then attempts to assert a clearly opposite position in a later proceeding.

United States v. Hammons, 2008 WL 1986700 at *5 (6th Cir. 2008).

There are two problems with invoking judicial estoppel to bar Jones' claims in this case. First, in the Chancery Court, Jones did not assert that he was unable to work at Nissan. True, Plaintiff testified that he could not lift as much as he could before, that he could not use power tools and that he therefore probably could not do the job in the body shop that he was performing at the time he was injured. However, on both direct and cross-examination at the trial in the Chancery Court, Jones testified unequivocally that he could do the job in body fit that he then held at Nissan. Second, the decision of the Chancery Court does not say that Plaintiff cannot work at Nissan. Instead, as already indicated, the ruling dealt with the discrete issue of whether Plaintiff had sustained a compensable injury under Tennessee's workers' compensation law. It simply is not incongruous for Jones, having received an award, to now argue that his being placed on a leave of absence because of receipt of that award amounted to disability discrimination under federal and state law because Nissan regarded him as disabled.

### 2. "Regarded as Disabled" and "Major Life Activity"

In this case, Jones does not claim that Nissan believed he was disabled. Instead, his claim is that Nissan regarded him as disabled.

"[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more

major life activities." <u>Murphy v. United Parcel Servs.</u>, 527 U.S. 516, 521-22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). The purpose of the "regarded as" theory is to protect individuals from being "rejected from a job because of the myths, fears and stereotypes associated with the disability." 29 C.F.R. pt. 1630, App. § 1630.2(l).

Nissan first argues "there can be no question that Nissan did not place Jones on a leave of absence due to 'myths or archaic attitudes about the disabled.'" (Docket Entry No. 22 at 16). Instead, Nissan claims it placed Jones on leave due to a court order. As already indicated, however, whether the Chancery Court ruling was the real basis for Nissan's decision presents a question of fact for the jury. This is particularly so since, "[u]nder the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent . . . [and] that question - i.e., the employer's motive - is one rarely susceptible to resolution at the summary judgment stage." <u>Ross v. Campbell Soup Co.</u>, 237 F.3d 701, 706 (6th Cir. 2001).

Nissan next argues that even if Jones can show that Nissan regarded him as disabled, he cannot show that he was substantially limited in performing a major life activity. In this regard, Nissan focuses on the major life activity of working.

As Nissan correctly observes, the Sixth Circuit "has repeatedly held that the major life activity of working is not substantially limited simply because an employee's physical or psychological impairment prevents him from performing a particular job." <u>Agnew v. Heat Treating Services of America</u>, 2005 WL 3550532 at * 5 (6th Cir. 2005)(collecting cases). "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 491 (1999).

16

Based upon these principles, Nissan argues Jones cannot establish he was perceived by Nissan as being substantially limited in the major life activity of working since all the record shows is that Jones may not have been able to work on an automobile production line. In support of its position, Nissan relies upon McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369 (6th Cir. 1997).

In McKay, the Sixth Circuit upheld the grant of summary judgment in favor of an automobile manufacturer where the record showed that the plaintiff's disability did not significantly restrict her ability to perform manufacturing jobs on an assembly line. However, the decision in McKay must be read in the context of the facts presented. There, at the time plaintiff was terminated from her assembly line job, she was restricted from lifting more than twenty pounds, was not allowed to use vibrating tools, and was not allowed to repetitively use her right hand. The record also reflected that plaintiff was a 24 year old college graduate who was working on her teacher's certificate. Based on the evidence presented, the Sixth Circuit concluded that the limitations imposed on plaintiff encompassed "only the narrow range of assembly line manufacturing jobs that require repetitive motion or frequent lifting of more than ten pounds." McKay, 110 F.3d at 373.

Here, even leaving aside the fact that Jones did not attend college and has spent his entire work career doing manual labor, the restrictions placed upon him by Dr. Kubina are much more onerous than those placed upon the plaintiff in McKay. The Court simply cannot conclude as a matter of law that a high school graduate who has spent the majority of his working life on an assembly line would not be precluded from a broad class of jobs where his restrictions consisted of "no lifting, no use of power tools, and no use of hand tools."

17

Moreover, Nissan's arguments do not directly address the restrictions upon <u>no</u> lifting. The Sixth Circuit has held that "'[l]ifting' in itself is a major life activity." <u>Wysong v. Dow Chemical Co.</u>, 503 F.3d 441, 452 (6th Cir. 2007). Obviously, one who is viewed as being restricted from any lifting is one who is regarded as being unable to perform the major life activity of lifting.

### 3. Solely Because of a Disability

Nissan argues Jones cannot satisfy the causation element of a *prima facie* case. In this regard, Nissan argues Jones cannot show that he was placed on leave *solely* because of his perceived disability.

The vast majority of circuit courts which have addressed the issue have "held that an employee may recover under the ADA if the employee's disability was a "motivating factor" in the employer's decision, and that the employee need not establish that he or she was fired 'solely' because of his or her disability." <u>Macy v. Hopkins County School Bd. of Educ.</u>, 484 F.3d 357, 364 (6th Cir. 2007)(collecting cases). However, borrowing language from the Rehabilitation Act, the Sixth Circuit has repeatedly held that in order to recover under the ADA, the plaintiff must show that he was discharged solely by reason of his disability or perceived disability. <u>Id</u>.

In this case, Nissan argues Jones cannot meet the "solely by reason of his disability" prong because in his deposition he testified that he did not believe he "was done right" by Nissan and that he thought "that Nissan basically let me go because of what happened at trial," i.e. the award and subsequent settlement he received from the workers' compensation trial. (Jones Depo. at 65 & 67). Nissan also points out that in the pending state court retaliation case, Jones alleges Nissan "discharged Plaintiff and refused to return him to work in retaliation for exercising rights under Tennessee's workers' compensation law, in violation of Tennessee law." (Docket Entry No. 22 at

22). Nissan asserts Jones "cannot have it both ways" (id. at 23) by claiming that he was placed on leave because in retaliation for his workers' compensation case, while at the same time arguing that the sole reason for his discharge was Nissan' perception that he was disabled.

Whether Jones was placed on leave because (1) he was perceived as disabled, (2) he filed a workers' compensation action, (3) for those reasons combined, or (4) for some other reason, presents a factual issue for the jury. While Jones may have stated in his deposition his belief that he was fired because of "what happened" at the workers' compensation trial does not preclude the possibility that the real and only reason for his termination was that Nissan perceived him as being disabled. Likewise, the fact that he filed a workers' compensation retaliation case does not preclude the possibility that he was terminated solely for reasons which violate the ADA and/or the THA, particularly since the retaliation case has not been decided and, in fact, has been stayed pending the outcome of this case.

### 4. After-acquired Evidence

During the course of his deposition in this case, Plaintiff admitted that, after he was placed on leave by Nissan, he took a job as a fleet manager for American Residential Services. Nissan argues that because this action was allegedly in violation of company policy, the Court should limit Jones' backpay up to the time of discovery of the offending conduct which was in January 2008 and preclude Jones from seeking reinstatement or front pay in lieu of reinstatement. Nissan relies upon McKennon v. Nashville Banner Pub. Co., 513 U.S. 352 (1995) for this argument.

In McKennon, the Supreme Court held an employee discharged in violation of the Age Discrimination in Employment Act is not barred from all relief when, after the discharge, the employer discovers evidence of wrongdoing which would have, in any event, led to the employee's

19

termination on lawful and legitimate grounds. However, the Supreme Court further held such after-acquired evidence is a defense which bears on "the specific remedy to be ordered." Id. at 885. In this regard, the Supreme Court concluded that, as a general rule in such cases, neither reinstatement nor front pay is an appropriate remedy, and that the "beginning point in a trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." Id. at 886.

It is not altogether clear if the defense announced in McKennon even applies to the facts of this case. In McKennon, the wrongdoing occurred while plaintiff was still employed, even though it was not discovered until after her termination. Here, to the contrary, the alleged wrongdoing occurred after termination and some courts have held that post-termination activity does not fall within the holding of McKennon. See, Dohen v. Gulfstream Training Academy, 2008 WL 961472 at **2-3 (S.D. Fla. 2008)(discussing cases).

Assuming McKennon applies, Nissan has not established its entitlement to the after-acquired evidence defense. To establish the defense, the defendant must show that the plaintiff's "wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." McKennon, 513 U.S. at 363-63. When evaluating the evidence submitted in support of the defense, "[t]he court must look to the employer's actual employment practices and not merely the standards articulated in its employment manuals, for things are often observed in the breach but not in the keeping." Sellers v. Mineta, 358 F.3d 1058, 1064 (8th Cir. 2004). Thus, "McKennon placed the burden of proof with respect to this issue on the employer, carefully articulating that the employer must establish not only that it could have fired an employee for the later-discovered misconduct, but that it would in fact

20

have done so." <u>O'Day v. McDonnell Douglas Helicopter Co.</u>, 7 F.3d 756, 759 (9th Cir. 1996)(emphasis in original).

In this case, Nissan has not met its summary judgment burden. The employee handbook at one point indicates that a peer review panel must sustain the termination of an employee who works for pay or profit while on approved leave without advance permission. At another point, the employee is instructed in the handbook that "[y]ou may be terminated for performing unauthorized work for pay, profit, or personal or family gain, while on any leave of absence." Apart from these potentially conflicting provisions, the Court has no evidence as to Nissan's actual practice when it discovers an employee who is on leave undertakes another job without prior approval. As such, the Court cannot conclude, as a matter of law, Nissan would have fired Jones when it learned of his employment at American Residential Services.

## C. **Plaintiff's Motion for Summary Judgment**

Like Nissan, Plaintiff raises various arguments in support of his Motion for Summary Judgment. However, many of the same issues of fact which preclude summary judgment in Nissan's favor also preclude summary judgment in favor of Jones. Because of the overlap in issues, the Court need not discuss Jones' motion in great detail.

With respect to the *prima facie* case, Jones claims that Nissan regarded him as disabled, believing that he was substantially limited in the major life activities of working, performing manual tasks, and lifting. The record is bereft of any evidence that Nissan considered any non-work related manual tasks when it made its decision to place Jones on leave, except insofar as lifting may be a part of such tasks. While the restriction against "no lifting" appears particularly damning, Nissan contends, and a jury could reasonably find, that restriction and the other restrictions placed upon

21

Jones were restrictions relating to work which could be performed on the production line at Nissan. Even though Nissan may have taken the view that Jones could not perform the production tasks at Nissan, this does not necessarily mean that Nissan regarded Jones as being substantially limited in the activity of working, or that he was unable to lift anything.  See, McKay, 110 F.3d at 373.

Moreover, in establishing a *prima facie* case, it is incumbent upon Jones to establish that the sole reason for the adverse employment action was his disability or perceived disability.  As already indicated, however, there is a genuine issue of material fact which was injected into this case by Jones' own deposition testimony and the filing of a lawsuit in which he claims that the reason for his placement on leave was the fact that he prevailed in his earlier workers' compensation case.

Jones' Motion for Summary Judgment and accompanying Memorandum also does not adequately take into account Nissan's stated reason for his being placed on leave.  Nissan claims Jones was place on leave in accordance with the Chancery Court order and that it honestly believed, pursuant to that order, Jones was unable to perform assembly line work at Nissan.  As already indicated, this goes directly to Nissan's intent and is not susceptible to determination as a matter of law based upon the inconclusive record before the court.

In support of his Motion for Summary Judgment, Jones relies heavily upon the Sixth Circuit's decision in Holiday v. City of Chattanooga, 206 F.3d 637 (6th Cir. 2000).  That case is distinguishable and, in any event, actually supports this Court's conclusion that the facts presented in the record are not amenable to summary judgment for either side.

In Holiday, plaintiff, a veteran police officer, was offered employment by the Chattanooga Police Department which was conditioned upon him passing the required physical examination. Plaintiff met with a contracting doctor and during the examination stated that he was  infected with

22

HIV.  The examining physician then completed the employment physical paperwork and indicated that plaintiff was not capable of performing the duties of a police officer because he was not strong enough to withstand the rigors of police work.  Plaintiff sued under the ADA, claiming he was not accepted as a police officer because of the stereotyping and myths surrounding those with HIV.  The district court granted the city's motion for summary judgment.

On appeal, the Sixth Circuit reversed and in doing so stated that plaintiff "has presented sufficient evidence that would allow a jury to conclude that [the examining physician] failed to undertake the individualized determination that the ADA requires and instead disqualified [plaintiff] because of his HIV status[.]" Id. at 644.  The Sixth Circuit then observed "[t]he doctor's complete failure to investigate the physical effects, if any, of [plaintiff's] HIV status raises a genuine issue of fact as to whether his subsequent opinion was the product of the ADA-mandated individualized inquiry into [plaintiff's] actual condition."  Id.

The facts in this case are obviously and critically different from those in Holiday.  Here, a Chancery Court judge heard evidence and made detailed remarks about Jones' ability to do certain things.  Given that ruling, as well as Nissan's alleged consideration of the jobs Jones could do in light of that ruling, a factual issue exists about the efficacy of the individualized inquiry, notwithstanding that Dr. Kubina may have only parroted what others believed the Chancery Court to be saying.

Because there are genuine issues as to whether Jones can establish each and every element of a *prima facie* case, and issues as to whether Nissan's stated reasons for placing Jones on a leave of absence was pretextual, summary judgment will not be granted.

## IV.  CONCLUSION

On the basis of the foregoing, the Motion for Summary Judgment filed by Nissan (Docket Entry No. 21) will be denied.  The Motion for Summary Judgment filed by Jones (Docket Entry No. 26) will also be denied.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE